**FARBENFABRIKEN BAYER A. G.,**
**Appellant,**

**v.**

**STERLING DRUG, Inc.**

**No. 12226.**

United States Court of Appeals
Third Circuit.

Argued Oct. 11, 1957.
Decided Jan. 2, 1958.

See also, 153 F.Supp. 589.

Milton V. Freeman, Washington, D. C., (Thurman Arnold, Edgar H. Brenner, Arnold, Fortas & Porter, Washington, D. C., Alexander T. Schenck, Bailey & Schenck, Newark, N. J., on the brief), for appellant.

John T. Cahill, New York City (Cahill, Gordon, Reindel & Ohl, Rogers, Hoge & Hills, New York City, O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS and McLAUGHLIN, Circuit Judges.

BIGGS, Chief Judge.

■ The plaintiff, Farbenfabriken Bayer A. G. (Farben), a corporation organized under the laws of the Federal Republic of West Germany, a former enemy alien within the meaning of Section 2(a) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix § 2(a), seeks an accounting and other relief against Sterling Drug, Inc. (Sterling), basing its claims on alleged breaches of a cartel agreement, occurring in 1941 or soon thereafter. These claims, choses-in-action, constitute "property" within the meaning of the Act, Propper v. Clark, 1949, 337 U.S. 472, 480, 69 S.Ct. 1333, 93 L.Ed. 1480, and were not seized by the Alien Property Custodian though subject to seizure and vesting under Section 5(b), 50 U.S.C.A.Appendix § 5(b). Sterling contends that Farben has **no**

right to "institute or maintain" its action, in view of the limitation or reservation contained in Joint Resolution No. 289, 65 Stat. 451, approved October 19, 1951, 50 U.S.C.A.Appendix, preceding section 1, p. XX. Sterling moved for judgment on the pleadings under Rule 12(c) and for summary judgment under Rule 56(b), Fed.R.Civ.Proc., 28 U.S.C. The Court below agreed with Sterling that Farben could not maintain its suit but did not concur in Sterling's view that it was entitled to a judgment on the merits under the rules cited and therefore dismissed the action without prejudice to Farben to institute and maintain a new action when the disqualification deemed by the court to have been imposed by Executive Order No. 8389, April 10, 1940, 5 Fed.Reg. 1400 as amended, Executive Order No. 8785, June 14, 1941, 6 Fed.Reg. 2897, 12 U.S.C.A. § 95a note, pursuant to Section 5(b) of the Act has been removed. See D.C.1957, 148 F. Supp. 733.

The Joint Resolution upon which Sterling relies is as follows: "That the state of war declared between the United States and the Government of Germany by the joint resolution of Congress approved December 11, 1941, is hereby terminated and such termination shall take effect on the date of enactment of this resolution [Oct. 19, 1951]: *Provided, however*, That notwithstanding this resolution and any proclamation issued by the President pursuant thereto, any property or interest which prior to January 1, 1947 was subject to vesting or seizure under the provisions of the Trading with the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, or which has heretofore been vested or seized under that Act, including accruals to or proceeds of any such property or interest, shall continue to be subject to the provisions of that Act in the same manner and to the same extent as if this resolution had not been adopted and such proclamation had not been issued. Nothing herein and nothing in such proclamation shall alter the status, as it existed immediately prior hereto, under that Act, of Germany or of any person with respect to any such property or interest." Following the enactment of the Joint Resolution President Truman on October 24, 1951 proclaimed a termination of the state of war with Germany. Proc. 2950, 16 F.R.(Oct.), p. 10,915, 50 U.S.C.A.App. prec. § 1 note.

Farben has advanced several theories under any one of which it asserts that it is entitled to maintain the present action. We will discuss its principal contention only for we deem it to be dispositive of the appeal. Put briefly Farben's principal argument is that the Joint Resolution and the Presidential Proclamation gives it *locus standi* in the court below and entitles it to maintain the suit even if it be the fact that its property under the Joint Resolution still remained subject to vesting and seizure. Sterling asserts that the "status" of the property under the Joint Resolution remains the same as when Farben was an enemy alien and since as an enemy alien it was unable to maintain a suit in our courts, it cannot do so now. We cannot agree.

■ Our primer in resolving the controversy is, of course, the Trading with the Enemy Act, as amended. We need not discuss the provisions of the Act at length for its purposes and its application are too well known. It is sufficient to state here that it authorized the President to sequester or seize property of enemy governments or enemy aliens, *inter alia*, as defined by Section 2, to the end that the United States might successfully prosecute all objects of war. United States v. Chemical Foundation, 1926, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131; Koehler v. Clark, 170 F.2d 779 (9 Cir., 1948). See Dulles, The Vesting Powers of the Alien Property Custodian. 28 Cornell L. Q. 245 (1943). See also the First War Powers Act, 55 Stat. 839 (1941), 50 U.S.C.A.App. Title III, amending Section 5(b) of the Trading with the Enemy Act. It is agreed that Farben was an enemy alien. It is also agreed that the property, the choses-in-action, which are the subject of this suit were never seized.

Nothing in the Act prohibits an enemy alien from maintaining a suit in our courts. In respect to the bringing of suits Section 7(b) of the Act provides in pertinent part: "Nothing in this Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of an enemy prior to the end of the war * * *." In short Congress in respect to an enemy maintaining a suit within the United States was content to rely on decisional or common law. The early rule of law, sometimes referred to very generally as "the common law rule," that the King's subjects had a duty to plunder the King's enemies, subsequently modified to a prohibition, personal to an enemy that *qua* enemy he could not maintain a suit, discussed in Petition of Bernheimer, 3 Cir., 1942, 130 F.2d 396, has been so altered that the Supreme Court has stated that "the sole objection to giving judgment for an alien enemy 'goes only so far as it would give aid and comfort to the other side.'" Ex Parte Kawato, 1942, 317 U.S. 69, 63 S.Ct. 115, 118, 87 L.Ed. 58, quoting in part from Birge-Forbes Co. v. Heye, 251 U.S. 317, 323, 40 S.Ct. 160, 64 L.Ed. 286.

▬ We are somewhat troubled by the statement in Kawato that "Section 7 bars from the courts only an 'enemy or ally of an enemy'", 317 U.S. at page 75, 63 S.Ct. at page 119, but we are of the opinion that a failure to authorize a suit is a bar to suit when the strict common law rule that an enemy cannot maintain a suit in our courts is in effect, and that this is what the Supreme Court had in mind. Cf. Ex parte Colonna, 1942, 314 U.S. 510, 62 S.Ct. 373, 86 L.Ed. 379, wherein it was stated *per curiam* by the Supreme Court refusing leave to file a petition for writs of mandamus and prohibition to be issued to this court: "This provision [Section 7(b)] was inserted in the act in the light of the principle recognized by Congress and by this Court that war suspends the right of enemy plaintiffs to prosecute actions in our courts."[1] It follows that we must hold that though the property, choses-in-action, was available to Farben prior to the declaration of war between the United States and Germany on December 11, 1941, 55 Stat. 796, upon the declaration of a state of war by Congress on that date, the right of Farben to institute suit was then suspended. The disability caused by the suspension was a personal one as we have stated. It was not a substantive failure of the causes of action. They continued to exist but could not be sued upon in a court in the United States.

On December 31, 1946, the President proclaimed the cessation of hostilities of World War II. See Proclamation 2950, supra. Then came the enactment of the Joint Resolution of October 19, 1951 with which we are concerned and Proclamation 2950 by the President followed it by four days. Whether or not Farben could have maintained its suit during the period from December 31, 1946 to October 19 or 21, 1951, is a question with which we need not concern ourselves for the suit at bar was commenced on September 28, 1955.

We are of the opinion that Farben is entitled to maintain its suit. The purpose of the Joint Resolution and its proviso is made very clear by its legislative history. The Joint Resolution was enacted at the request of the President. The Senate Report, Sen.Rept. 892, 82nd Cong., 1st Sess., Para. 8 (1951),[2] refers

---

1. Even if this authoritative decision as to suspension did not exist the legislative history of the Act and the prior decisions of the Supreme Court given in the final paragraph of the opinion, 314 U.S. at page 511, 62 S.Ct. at page 373, and which need not be repeated here, would leave no doubt as to the correctness of our conclusion.

2. The President wrote as to why the vesting power should not lapse, as follows: "Most of this German property has already been identified and vested. This Government does not intend to embark on any new program in this field. However, some of the property already subject to vesting is believed to be cloaked or hidden and not yet discovered, and some is still under examination or sub-

**304**

to the Presidential message, quoting from it the reason for the President's request. This was that it was necessary to retain control of German property already vested and possibly to vest other German property, even though the war had terminated.

Congress intended to terminate the state of war so as to remove the disqualifications of German nationals as enemies but deemed it necessary to make certain that the President should retain the right to vest certain German property. The proviso of the Joint Resolution was designed to effect this end; a result which was deemed to be in doubt "unless expressly provided for in new legislation." [3] The terms of the proviso were held to effect the result intended. Ladue & Co. v. Brownell, 7 Cir., 1955, 220 F.2d 468. In brief it was the intention of Congress to effect peace between the Federal Republic of West Germany and German nationals and the United States

and to restore the normal rights and relations ordinarily in effect between friendly peoples but to retain and obtain control of Germanic property in the United States under Section 5(b) of the Act where necessary.[4] We have no doubt the legal effect of the Joint Resolution and the Proclamation engrafted on the Trading with the Enemy Act was to wipe out the suspension of the right of a German national to bring suit in the United States.

■ The error of the court below lies, we believe, in its approach to the term "status" as employed in the Joint Resolution. While the court properly held that property of a former German enemy alien was subject to vesting and seizure at the will of the Executive, the primary concern of both the President and the Congress was with the power of the Executive to vest property and not with access to courts in the United States. The term "status" is properly used in respect to a

ject to legal proceedings. Most of the property remaining unvested is involved in problems of conflicting jurisdiction between this and other governments, which are in the process of settlement by negotiation under authority of legislation which was enacted in September of last year.

"Should the vesting power lapse immediately, this Government would find it difficult to wind up this program in an orderly way, or to carry out its commitments for the equitable settlement of intergovernmental differences relating to enemy property." U.S.Code Cong. & Adm. & Service 1951, p. 2358.

3. The purpose of the proviso of the Joint Resolution was stated as follows: "In the absence of treaty provisions, however, there may be legal obstacles to the continued vesting of German property, after the termination of the state of war, unless there are changes in our existing statutes. According to the terms of the Trading With the Enemy Act, many of its powers expire at the 'end of the war,' a phrase which the act defines to mean the date of proclaiming the exchange of ratifications of a treaty of peace, or an earlier date fixed by Presidential proclamation. There is some doubt that the vesting powers of the Trading With the Enemy Act can be exercised after the termination of

the state of war, unless expressly provided for in new legislation.

"This doubt should be eliminated, and it should be made clear that the Congress intends the vesting of German property for the purpose of paying war claims to continue." See Sen.Rept. 892, 82nd Cong., 1st Sess., Para. 8.

4. By 1951, as we have indicated, the German people in the Western Zones of Germany had created the Federal Republic of West Germany resting upon a democratic constitution which had been approved by the western occupation powers. That Republic became a member of many international organizations and prepared to take an active part in assuring world peace. The United States was trading with Germany, and property which was brought into this country after 1947 was not subject to vesting. General License 94, 31 C.F.R. § 131–94 (1947 Supp.), 12 F.R. 2051 (1954). Under such circumstances Congress considered it paradoxical and inconsistent that Germany should retain "enemy status." As a result, the Joint Resolution was enacted so that the "technical and legal relationships between the United States and the Federal Republic of Germany should be made to conform with reality." Sen.Rept. No. 892, Oct. 8, 1951, Part. 4.

relationship to property, viz., ownership of property or a right to possess property. The proviso deals with ownership in or a right to property. The right to bring a suit, to access to a court may not be described properly as a status. It is a general right of a procedural, not of a substantive, character. One does not say that a plaintiff possesses the status to bring a suit. He either has a right to maintain a suit or he does not but his right of access to a court is a personal qualification and is not a *status*.

We conclude therefore that Farben is entitled to maintain its suit and, if the nature of its causes of action and the evidence permit, to secure judgment in the court below. Beyond this the way is pointed out by Zittman v. McGrath, 1951, 341 U.S. 446, 449–552, 71 S.Ct. 832, 95 L.Ed. 1096, which held that attachment levies against American holders of claims against German banks were not nullities though, of course, transfer of the funds could not be effected without a license. See Propper v. Clark, 1949, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480, Orvis v. Brownell, 1952, 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938, Mr. Justice Douglas' dissenting opinion *id*. at page 345 U.S. 191, 73 S.Ct. at page 600, and Commission for Polish Relief v. Banca Nationala a Rumaniei, 1942, 288 N.Y. 332, 43 N.E. 2d 345. In Zittman the claims had been vested in the Alien Property Custodian, while Farben's claims have not been seized. Public Circular No. 31, 8 C.F.R. § 511.331(d), throws light upon the problem confronting us. This explains the purpose of General Ruling No. 12, 8 C.F.R., § 511.212, promulgated pursuant to Section 5(b) of the Trading with the Enemy Act. In pertinent part Section 511.212(d) states that the Treasury does not desire to interfere with litigation concerning enemy aliens "so long as it is clearly understood that judicial process cannot, without a license or other authorization from the Secretary of the Treasury, operate to transfer or create any interest in blocked property." In so holding we assume *arguendo* that Farben's claims are still blocked or frozen by Ex-

ecutive Order 8389 as amended by Executive Order 8785 and General Rule No. 12. We need go no further to dispose of the appeal at bar for Farben may not secure a judgment against Sterling. If Farben should secure a judgment against Sterling and then seek execution on the judgment, it will be necessary for the court below to determine whether General License No. 101, Section 511.101, 8 C.F.R. (Cum.Supp.) has freed Farben's claims then reduced to judgment.

The judgment of the court below will be reversed with the direction to proceed with the case in accordance with this opinion.